# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

PAMELA VIRGINIA PERSONS,

      **Plaintiff,**

                            **Case No. 2:16-cv-548**
   v.                          **JUDGE JAMES L. GRAHAM**
                                   **Chief Magistrate Judge Elizabeth P. Deavers**

COMMISSIONER OF SOCIAL
SECURITY,

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Pamela Virginia Persons, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Social Security Supplemental Security Income benefits. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 11) ("SOE"), the Commissioner's Memorandum in Opposition (ECF No. 16), Plaintiff's Reply (ECF No. 17), and the administrative record (ECF No. 8). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.   BACKGROUND

Plaintiff filed her application for benefits on February 13, 2013, alleging that she has been disabled since March 1, 2012, due to scoliosis and back and hip pain. (R. at 170–79, 196.) Plaintiff's application was denied initially and upon reconsideration. (R. at 94–101, 116–20.) Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 121–23.)

Administrative Law Judge William Spalo ("ALJ") held a hearing by video on December 31, 2014, at which Plaintiff, who was represented by counsel, appeared and testified. (R. at 56–86.) On March 16, 2015, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 46–52.) On April 29, 2016, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–7.) Plaintiff then timely commenced the instant action.

## II.  HEARING TESTIMONY[1]

### A.  Plaintiff's Testimony

Plaintiff testified at the administrative hearing that she is married, lives with her husband, and has no children under the age of eighteen. (R. at 61–62.) Plaintiff is five feet, eight inches tall, and weighs 201 pounds. (R. at 62.) Plaintiff stated that she quit school in the middle of twelfth grade and did not graduate. (R. at 63.) Plaintiff represented that she has no training, certificates, or licenses. (*Id.*)

Plaintiff stated that she is currently working as a janitor for a company owned by her and her husband, which started in 1998. (*Id.*) Plaintiff explained that this family company goes into a store and runs a service, cleaning, mopping, and sweeping. (R. at 64.) Plaintiff agreed that these tasks are physical work, requiring her to be on her feet, run equipment, and lift twenty to twenty-five pounds. (R. at 64–65.) She stated that she used to help lift a "buffer," which weighs 500 pounds, but that she stopped doing that a couple of years ago. (R. at 65.) Plaintiff testified that if she works for an hour and a half, she would probably sit down approximately three or four different times because of numbness in her leg from standing. (R. at 75–76.) Plaintiff also takes

---

[1] The Undersigned limits the analysis of the evidence and the administrative decision to the issues raised in the SOE, *i.e.*, that the ALJ erred in denying Plaintiff's claim at step two of the sequential evaluation process.

care of the books for the business, but does not use a computer.  (R. at 70–71.)  Plaintiff stated that she works approximately twenty-two hours a week and that this family business earns approximately $13,000 to $14,000 a year.  (R. at 64.)  This business's income had been reported under her husband's Social Security number since 2001.  (R. at 65.)  Plaintiff does not collect any unemployment compensation, worker's compensation, or food stamps, and does not receive public assistance.  (R. at 67.)  She gets her health insurance through Medicaid, which enables her to see her doctor and get treatment.  (*Id.*)

Plaintiff testified that she has a lot of pain in both of her hips and back.  (R. at 65.)  Plaintiff represented that she had been diagnosed with osteoarthritis in both hips and that she has scoliosis.  (R. at 66.)  Plaintiff stated that her doctor performed a series of x-rays in September and then diagnosed Plaintiff with osteoarthritis.  (*Id.*)  At that time, her doctor prescribed Hydrocodone and another pain medication with a muscle relaxer in it.  (*Id.*)  Plaintiff stated that while these pain medications helped, she had to wait until she finished working to take them because they made her sleepy and feel kind of off balance.  (*Id.*)  Plaintiff also testified that her right leg started to feel numb beginning in March 2014.  (R. at 68–69.)  Plaintiff represented that her doctor told her that Plaintiff's nerves in her hips and back caused this numbness.  (R. at 69.)  Plaintiff denied that surgery was suggested, but stated that she received a pain shot in her left hip in August 2014, which helped for a while.  (*Id.*)  Plaintiff testified that her doctor gave her exercises to do.  (*Id.*)  While Plaintiff has done these exercises, she did not find them very helpful.  (R. at 69–70.)

Plaintiff stated that she has a driver's license, but does not drive very often because of numbness in her right leg.  (R. at 68.)

Plaintiff testified that she cooked for herself and her husband although she sometimes has to sit down because of back and hip pain. (R. at 70, 78–79.) She also helps to clean up after cooking and does her dishes. (*Id*.) Plaintiff does the grocery shopping, but her husband drives her there because of her leg numbness. (R. at 72.) By the time she is finished grocery shopping, she is bent over her and leaning on her cart. (R. at 78.) Plaintiff is capable of putting on her own socks and tying her own shoes. (R. at 74.) Plaintiff stated she also does the laundry and takes breaks when she cleans the six-room trailer home. (R. at 71, 77–78.) However, she does not "clean clean," merely straightens it, because she has to return to work that night. (R. at 78.)

Plaintiff stated that her husband takes care of the four dogs that they own that stay outside all of the time. (R. at 71.) Plaintiff testified that she and her husband go to the movies "[m]aybe once in a great while." (R. at 72.) She does not do any yard work, but likes to needlepoint, read romantic novels, and watch soap operas on television. (R. at 72–73.) Plaintiff naps for approximately two hours every day. (R. at 74.) She socializes with friends approximately once a month when those friends come to visit Plaintiff's house. (R. at 72.) Plaintiff has two children and five grandchildren. (R. at 73.) The grandchildren are twenty-one, sixteen, twelve, eleven, and eight years old. (*Id*.) Plaintiff testified that she plays with them, such as when she goes out in the yard and passes a ball to them and watches television and movies with them. (*Id*.)

**B.  Vocational Expert Testimony**

Jacqueline Pethel testified as a vocational expert ("VE") at the December 31, 2014, administrative hearing. (R. at 80–84.) The VE testified that Plaintiff's past employment included floor maintenance worker, a medium exertion, unskilled position, and a general ledger bookkeeper, a sedentary, skilled position. (R. at 80–81.) The ALJ proposed a hypothetical that presumed an individual with Plaintiff's age, education, and work experience, capable of

performing work at the medium exertional level, with no kneeling, crawling, climbing ladders, ropes or scaffolds , and capable of occasional crouching, stopping, climbing ramps and stairs. (R. at 81.)  The VE testified that such an individual could not perform past work as a floor maintenance worker, but could perform past work as a bookkeeper as it was generally performed.  (*Id*.)  The VE testified that such an individual could not perform the bookkeeper job as Plaintiff performed it because it encompassed the floor maintenance work.  (*Id*.)  The VE further testified that the hypothetical individual could perform work as a cleaner II, motor vehicle assembler, and laundry worker, all of which were medium exertion, unskilled positions. (R. at 81–82.)  The ALJ next proposed a hypothetical that presumed an individual with Plaintiff's age, education, and work experience, who was limited to light work with no crawling, kneeling, climbing ladders, ropes, or scaffolds, with occasional ramps, stairs, stooping, and crouching.  (R. at 82.)  The VE testified that such a hypothetical individual would be unable to past work as a bookkeeper as generally performed.  (*Id*.)  Asked to assume the same hypothetical individual who was limited to sedentary work with additional limitations of requiring three extra breaks of each fifteen minutes, in addition to normal breaks and lunch.  (R. at 82–83.)  The VE testified that such limitations would rule out work all together for this hypothetical individual. (R. at 83.)

### III.    MEDICAL RECORDS

**A.    Sushil Sethi, M.D.**

On July 30, 2013, Plaintiff presented to Sushil Sethi, M.D. for a consultative examination.  (R. at 262–69.)  Plaintiff reported that she has had back pain for several years but that she has never had surgery on her spine, injections, or pain management.  (R. at 263.) Plaintiff thought that "someone told her that she might have a touch of scoliosis."  (*Id*.)  Plaintiff

thought her symptoms "are more so" when she heavily exerts herself when performing tasks such as cleaning the house or doing lawn work. (*Id.*) She did not have any paralysis or weakness in her extremities. (*Id.*) At the time of the examination, Plaintiff took over-the-counter medication such as aspirin and Tylenol and had a prescription for Gabapentin and she used to take Naproxen. (R. at 263–64.) Plaintiff continued to smoke one-half to one pack of cigarettes per day. (R. at 264.) She reported that she has performed janitorial and office work for her husband. (*Id.*)

A physical examination revealed normal range of motion of the hips. (*Id.*) Plaintiff was able to walk on tiptoes and heels and squat without the use of ambulatory aids and her gait was normal. (*Id.*) There was no muscle weakness or atrophy. (R. at 265.) The cervical and thoracic areas of the spines showed no muscle spasm or guarding or swelling, redness, curvature abnormality, or deformity in the spine. (*Id.*) The range of motion of the cervical spine showed forward flexion 50 degrees, extension 40 degrees, right and left lateral flexion 35 degrees and rotation to the right and left 70 degrees. (*Id.*) The range of motion of the thoracic spine was normal. (*Id.*) The lumbar spine showed diffuse, non-specific tenderness in the sacroiliac area bilaterally, but no muscle spasm and no guarding or curvature abnormality. (*Id.*) The lumbar spine range of motion was forward flexion 65 degrees, extension 20 degrees, right and left lateral flexion 25 degrees and rotation to the right and left 30 degrees. (*Id.*) The straight-leg raising test was negative at 90-degree hip flexion. (*Id.*) Plaintiff's neurological exam revealed intact cranial nerves II through XII, normal deep tendon reflexes, and normal motor and sensory exams. (*Id.*)

X-rays of the lumbosacral spine taken by Dr. Sethi showed moderate lordosis toward the left side with maximum apex at L3. (*Id.*) Marked degree of facet arthropathy was noted at L2–L5, with large osteophytes present, more so on the left than the right, at the facet joints. (*Id.*)

The sacroiliac joints and hip joints were normal with no fracture or dislocation. (*Id.*) The intervertebral spaces between L3–4 and L4–5 were decreased to 2–3 millimeters, which reflected "[m]oderately severe osteoarthritis of the lumbosacral spine, maximally at L3–4–5, and facet arthritis." (*Id.*) No spondylolisthesis was noted. (*Id.*)

Based on these findings, Dr. Sethi concluded that Plaintiff's "ability to do work-related physical activities such as sitting, standing, walking, lifting, carrying and handling objects is normal. Her hearing, speaking and traveling are normal." (*Id.*)

**B.      State-Agency Evaluations**

On August 2, 2013, Steve E. McKee, M.D., a state-agency physician, reviewed Plaintiff's medical record. (R. at 94–101.) In reviewing the findings from Dr. Sethi's examination, Dr. McKee noted that Plaintiff had a normal gait without the assistance of an ambulatory aid and that Plaintiff had a normal range of motion in her knees and upper and lower extremities. (R. at 99.) Dr. McKee further noted that the x-ray of Plaintiff's lumbar spine revealed no fracture or dislocation, moderate lordosis on the left side, and fact arthropathy at L2–L5. (*Id.*) Based on this record, Dr. McKee concluded that Plaintiff's physical condition "causes no more than minimal limitations to her daily activities. Not severe." (*Id.*) Dr. McKee found Plaintiff "partially credible[,]" as the exam findings and findings of normal strength and gait did not support her alleged limitations in lifting and walking. (R. at 100.)

On September 25, 2013, Diane Manos, M.D., reviewed the record upon reconsideration. (R. at 104–09.) Plaintiff did not allege a worsening of conditions or changes in activities of daily living upon reconsideration. (R. at 107.) Dr. Manos concluded that Plaintiff did not have a severe impairment or combination of impairments that significantly limited her physical or mental ability to do basic work activities. (R. at 108.) Like Dr. McKee, Dr. Manos found

Plaintiff to be only partially credible because her reported limitations were not supported by normal exam findings and findings of normal strength and gait.  (*Id*.)

**C.      Lorena Donofrio, D.O., Hopewell Health Centers**

On October 24, 2013, Plaintiff presented to Lorena Donofrio, D.O., for left shin pain and a flu vaccine.  (R. at 315–16.)  Plaintiff complained that she had arthritic pain in her left shin that "was gone as quick as it came."  (*Id*.)  Plaintiff did not complain of hip or back pain during this visit.  (*Id*.)

On January 16, 2014, Plaintiff presented to Dr. Donofrio, complaining of right hip pain, worsening symptoms, and numbness in her right leg.  (R. at 310.)  An examination revealed tenderness over trochanteric bursa and limited range of motion secondary to pain.  (R. at 312.)  Dr. Donofrio noted that if no x-ray of the lumbar spine is done, a study will need to be ordered.  (R. at 313.)  Dr. Donofrio also considered an EMG study to further evaluate Plaintiff.  (*Id*.)  Dr. Donofrio refilled Plaintiff's prescriptions.  (R. at 313–14.)

On April 2, 2014, Plaintiff reported that the reasons for her visit with the nurse practitioner, Farhana Hamid, CNP, at Hopewell Health Centers were to review laboratory results and for complaints of hip pain.  (R. at 306.)  However, in summarizing the visit, Nurse Hamid reported that Plaintiff presented "to review labs.  [N]o concerns otherwise., Subjectively well., No changes., No concerns., No new complaints."  (*Id*.)  Nurse Hamid ordered a women's health exam in four weeks.  (R. at 308.)

Upon examination on April 30, 2014, Dr. Donofrio reported that Plaintiff said she was "doing well and without any complaints today" with no side effects from medicine.  (R. at 304.)

During appointments with Dr. Donofrio in May 2014 and July 2014, Plaintiff did not report any hip or back pain.  (R. at 294–302.)

8

On August 20, 2014, Plaintiff presented to Dr. Donofrio, complaining of left hip pain. (R. at 291.) Plaintiff reported that the left hip pain has been present for weeks, that the onset of the pain was moderate and "sudden, after physical activity, began after she had been working all day, however, no specific injury." (*Id*.) Dr. Donofrio noted moderate tenderness over left trochanteric bursa and limited active and passive range of motion secondary to pain, especially with hip flexion, abduction, and adduction. (R. at 292.) No vertebral spine tenderness was noted and Plaintiff's gait revealed she favored the affected side. (*Id*.)

X-rays of Plaintiff's hips taken on August 28, 2014, revealed "mild hip joint space narrowing bilaterally," "mild spurring along the right greater trochanter," no visible fracture, normal pubic symphysis and SI joints, and "moderate to severe degenerative changes in the lower lumbar spine, which is incompletely imaged. . . . Mild bilateral osteoarthritis in the hips." (R. at 340.)

At a follow-up visit on September 8, 2014, Dr. Donofrio reported that Plaintiff's left hip pain is "much better" and that Plaintiff is "without any new complaints/concerns." (R. at 289.) Dr. Donofrio diagnosed Plaintiff with osteoarthritis of both hips. (*Id*.)

On October 14, 2014, Plaintiff presented to Dr. Donofrio, requesting a refill of pain medication previously prescribed to her in August 2014. (R. at 283.) Dr. Donofrio noted that Plaintiff reported "significant benefit in symptoms with taking the medications when she needs them" and "wonderful results with taking Florajen, 'They're my miracle pill[.]'" (*Id*.) Plaintiff did not have any new concerns or complaints. (*Id*.) Upon examination, Dr. Donofrio noted diffuse lumbosacral tenderness and left sacroiliac joint tenderness as well as mild tenderness to palpation lumbosacral spine paravertebral muscles bilaterally. (R. at 286.)

# IV.    ADMINISTRATIVE DECISION

On March 16, 2015, the ALJ issued his decision.  (R. at 46–52.)  At step one of the

sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially

gainful activity since February 13, 2013, the application date.  (R. at 48.)

At step two, the ALJ determined that Plaintiff had the medically determinable

impairments of arthritis in both hips, mild degenerative disc disease of the lumbar spine, and

obesity.  (R. at 48.)  The ALJ found Plaintiff credible as to the existence of her impairments, but

did not find her credible regarding the severity and persistence of her symptoms and the

functional limitations they allegedly caused.  (R. at 51.)  The ALJ gave great weight to Dr.

Sethi's opinion that Plaintiff's ability to perform work-related physical activities, such as sitting,

standing, walking, lifting, carrying, and handling objects, was normal because the opinion was

consistent with the overall record evidence.  (*Id*.)  The ALJ also gave great weight to the

opinions of the state-agency consultants, which were consistent with the overall record and

which contained no indication that Plaintiff's conditions caused any work-related limitations.

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence.  *See* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive
finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th
Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.    Is the claimant engaged in substantial gainful activity?
2.    Does the claimant suffer from one or more severe impairments?
3.    Do the claimant's severe impairments, alone or in combination, meet or
      equal the criteria of an impairment set forth in the Commissioner's Listing of
      Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.    Considering the claimant's residual functional capacity, can the claimant
      perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and residual
      functional capacity, can the claimant perform other work available in the national
      economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

(R. at 51–52.)  Considering Plaintiff's age, weight, work experience, and relying on the opinions of the consultative examiner and the state agency medical consultants, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that significantly limited her ability to perform basic work activities.  (R. at 48–52.)  Having so determined, the ALJ did not proceed to the next step of the sequential evaluation process.  (R. at 46, 48–52.)  The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 52.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746

(6th Cir. 2007)).

# VI.   ANALYSIS

Plaintiff advances one contention of error.  Plaintiff asserts that the ALJ erred in denying

her claim at step two of the sequential evaluation process.  At this step, Plaintiff has the burden

of showing that she suffers from a severe impairment, which is an "impairment or combination

of impairments which significantly limits [her] physical or mental ability to do basic work

activities[.]"  20 C.F.R. § 404.1520(c).  "Basic work activities" means "the abilities and aptitudes

necessary to do most jobs."  20 C.F.R. § 404.1522(b).  Examples of these include the following:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling,
> reaching, carrying, or handling;
>
> (2) Capacities for seeing, hearing, and speaking;
>
> (3) Understanding, carrying out, and remembering simple instructions;
>
> (4) Use of judgment;
>
> (5) Responding appropriately to supervision, co-workers and usual work
> situations; and
>
> (6) Dealing with changes in a routine work setting.

*Id.*

The United States Court of Appeals for the Sixth Circuit has construed Plaintiff's burden

at step two as "a *de minimis* hurdle in the disability determination process."  *Higgs v. Bowen*, 880

F.2d 860, 862 (6th Cir. 1988).  The inquiry is therefore "employed as an administrative

convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Id*. at 863.  Under this analysis, a court may construe an impairment as not severe "only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Id*. at 862; *see also Farris v. Sec'y of Health & Human Servs*., 773 F.2d 85, 90 (6th Cir. 1985) ("[T]he question [at step two] . . . is whether there is substantial evidence in the record supporting the ALJ's finding that [Plaintiff] has only a 'slight' impairment that does not affect [her] ability to work.").  However, while Plaintiff bears a *de minimis* burden, "[t]he mere diagnosis [of an impairment], of course, says nothing about the severity of the condition." *Higgs*, 880 F.2d at 863.  Thus, if no signs or laboratory findings substantiate the existence of an impairment or if such an impairment or combination of impairments does not significantly limit the ability to do basic work activities, it is appropriate to terminate the disability analysis.  *See* SSR 96-4p, 1996 WL 374187, at *2 (July 2, 1996) ("In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process set out in 20 CFR 404.1520 and 416.920 . . . .");  20 C.F.R. § 416.920(c) ("If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled.").

Here, the ALJ discussed the results of Dr. Sethi's consultation examination in July 2013, and Dr. Sethi's opinion that Plaintiff's ability to perform work-related physical activities, such as sitting, standing, walking, lifting, carrying, and handling objects, was normal.  (R. at 50–51.) The ALJ gave "great weight" to Dr. Sethi's opinion because it was consistent with the overall evidence in the record and "[t]here is no indication in any of the claimant's treatment records that

her conditions cause any work-related limitations." (R. at 51.) The ALJ similarly gave "great weight" to the opinions of the state-agency medical consultants who determined that Plaintiff did not have any severe impairments. (*Id*.) The ALJ found these opinions to be consistent with the overall record evidence and that the treatment records did not indicate that Plaintiff's conditions caused any work-related limitations. (R. at 51–52.) The ALJ also addressed Plaintiff's credibility and obesity when explaining his findings at step two as follows:

> The records also reveal that the claimant has issues with obesity. She noted in her disability report that she was 5'8" and 195 pounds (2E/2). She was 67.75 inches and 206.4 pounds with a body mass index ("BMI") of 33.56 on June 18, 2013 (1F/4). She was 67.75 inches and 203 pounds with a BMI of 33.05 on October 14, 2014 (4F/3). At the hearing, she testified that she is currently 5'8" and 201 pounds. However, she did not testify that obesity causes any limitations on her ability to perform work-related activities. Pursuant to Social Security Ruling 02-1p, I have taken into consideration the claimant's obesity, both singly and in combination with her other impairments, but do not find that the evidence shows that this condition causes any work related limitations.

> Although I find the claimant credible as to the existence of her impairments, I do not find credible her allegations regarding the severity and persistence of her symptoms as well as the functional limitations that they allegedly cause. I find that the claimant has not met her burden of proving that she is disabled (20 CFR 416.912). I have considered the factors set forth in Social Security Ruling 96-7p along with the objective medical evidence in assessing the claimant's credibility. While the claimant filed her application in February 2013, the records do not document complaints of hip or back pain or treatment for these alleged severe conditions until 2014. The claimant did not indicate that she has any impediments to access to care and testified that she receives treatment that is covered by Medicaid. The treatment records show relatively mild diagnostic findings and minimal examination findings related to her alleged hip and back impairments. The claimant has reported improvement in her symptoms with medications that she takes as needed. The claimant has also indicated that she is able to perform a variety of activities of daily living. She also testified that she continues to work and that she lifts about 20 to 25 pounds in performing her work-related duties. While I note that the claimant's ability to perform these activities does not solely support finding that her impairments are not severe, this is just another credibility factor I have considered in reaching this opinion. Based on the overall evidence of record, including the testimony at the hearing, I find the claimant's allegations not fully credible.

(R. at 51.)

In making this determination, the ALJ specifically considered the medical evidence reflecting Plaintiff's treatment records from 2014, which post-dated the reviews of Dr. Sethi and the state-agency consultations. In detailing this evidence, the ALJ found that there was no indication that Plaintiff's conditions caused any work-related limitations. (R. at 50.) The ALJ noted that the "records indicate that the claimant reported significant benefit in symptoms with taking pain medications when needed[.]" (*Id.*)

In reviewing this analysis, the Undersigned finds that the ALJ applied the appropriate "*de minimis*" standard and did not, as Plaintiff contends, apply a higher standard at step two (SOE at 8–11; Reply at 1–3). *See Turner v. Comm'r of Soc. Sec.*, No. 14-1035, 2015 WL 251496 (W.D. Tenn. Jan. 20, 2015) (finding that the ALJ applied the correct legal standard when concluding at step two of the sequential analysis that the plaintiff did not show that his medically determinable impairments were severe and that the plaintiff was therefore not disabled). Plaintiff complains that the treatment records reflect marked degeneration in her hips and spine; pain and numbness while walking, driving, standing, and sitting; the need to take breaks during meal preparation; drowsiness from medication; and her daily two-hour nap, all of which she argues limit her ability to perform basic work activities. (*Id.*) However, in advancing this argument, Plaintiff simply describes her medical conditions. She does not point to any evidence in the record that supports her assertion that these conditions limit her ability to perform basic work activities. Notably, Dr. Donofrio, Plaintiff's treating physician, never opined that any of Plaintiff's medical conditions significantly limit, or even impact, her ability to perform basic work activities. Indeed, the mere diagnosis of any condition does not establish that an impairment is severe. *Higgs*, 880 F.2d at 863; *Carpenter v. Comm'r of Soc. Sec.*, No. 3:16 CV 720, 2017 WL 1038913, at *11 (N.D. Ohio

Mar. 17, 2017) ("[D]iagnosis of a condition alone does not necessarily make the condition severe.").

Moreover, the medical record amply supports the ALJ's findings. For example, the ALJ noted that while Plaintiff filed her application in February 2013, and alleged an onset date of March 1, 2012, the medical records do not reflect complaints of hip or back pain or treatment for these alleged conditions until 2014, even though Plaintiff saw Dr. Donofrio after she filed her application for benefits. (R. 46, 51, 310–16.) During that visit in October 2013, Plaintiff simply complained that she had arthritic pain in her left shin that "was gone as quick as it came." (R. at 315–16.) Where Plaintiff has the burden of presenting medical evidence as to the existence of and severity of her impairments, this evidence undermines Plaintiff's alleged onset date of March 1, 2012, and supports the ALJ's findings at step two. 20 C.F.R. § 404.1512(c).

Dr. Sethi's opinion further supports the ALJ's findings. Plaintiff complains, however, that Dr. Sethi's conclusion that Plaintiff had normal abilities to perform work-related activities is unsupported by findings in his own report. (SOE at 2.) This argument is not well taken. As detailed above, Plaintiff reported back pain only during heavy exertion, but she also reported that she took only over-the-counter medication such as aspirin or Tylenol. (R. at 263.) Her examination revealed normal range of motion of the hips; the ability to walk on tiptoes and heels and squat without the use of ambulatory aids; normal gait; no muscle weakness or atrophy or guarding or swelling, redness, curvature abnormality, or deformity in the spine. (R. at 264–65.) The range of motion of the thoracic spine was normal and the range of motion of the cervical spine showed forward flexion 50 degrees, extension 40 degrees, right and left lateral flexion 35 degrees and rotation to the right and left 70 degrees. (R. at 265.) The lumbar spine showed diffuse, non-specific tenderness in the sacroiliac area bilaterally, but no muscle spasm and no

guarding or curvature abnormality.  (*Id*.)  The lumbar spine range of motion was forward flexion 65 degrees, extension 20 degrees, right and left lateral flexion 25 degrees and rotation to the right and left 30 degrees.  (*Id*.)  The straight-leg raising test was negative at 90-degree hip flexion. (*Id*.)  Although x-rays taken by revealed some degree of lordosis, arthropathy, and osteoarthritis, Dr. Sethi also noted that the sacroiliac joints and hip joints were normal with no fracture or dislocation, and noted no spondylolisthesis.  (*Id*.)  Based on these findings, Dr. Sethi concluded that Plaintiff's "ability to do work-related physical activities such as sitting, standing, walking, lifting, carrying and handling objects is normal.  Her hearing, speaking and traveling are normal."  (*Id*.)  The medical findings during his examination supports Dr. Sethi's conclusion in this regard.

Dr. Sethi's conclusion is also consistent with the record as a whole.  As set forth above, Plaintiff provides no documented complaints of hip or back pain until January 2014, even though she admitted during the administrative hearing that she had access to health care through Medicaid.  (R. 67, 310–16.)  In April, May, and July 2014, Plaintiff was seen by both a nurse practitioner at Hopewell Health Centers and Dr. Donofrio, but she reported no complaints of pain during these visits and those records reflect that Plaintiff was doing well.  (R. at 294–302, 304, 306, 308.)  While Plaintiff complained of ongoing hip pain in August 2014, x-rays taken in late August 2014 revealed mild bilateral osteoarthritis in the hips and Plaintiff reported in early September 2014 that the pain was much better.  (R. 289, 291–92, 310–14, 340.)  Notably, in October 2014, Dr. Donofrio noted that Plaintiff reported "significant benefit in symptoms with taking the medications when she needs them" and "wonderful results with taking Florajen, 'They're my miracle pill[.]'"  (R. at 283.)  Plaintiff did not have any new concerns or complaints. (*Id*.)  In addition, Dr. Donofrio never opined that any of Plaintiff's conditions or pain associated

with those conditions imposed any limitations on her work-related activities. The medical

evidence dated after Dr. Sethi's examination therefore supports his findings.[3]  Notably, "[w]hen

'doctors' reports contain no information regarding physical limitations or the intensity,

frequency, and duration of pain associated with a condition,' the Sixth Circuit 'has regularly

found substantial evidence to support a finding of no severe impairment.'" *See Baker v.

Berryhill*, No. 16-165-DLB, 2017 WL 1424898, at * (E.D. Ky. Apr. 20, 2017) (quoting Despins

v. Comm'r of Soc. Sec., 257 F. App'x 923, 930 (6th Cir. 2007)).

Plaintiff nevertheless insists that her testimony regarding her pain and limitations

supports the severity and persistence of her symptoms, apparently challenging the ALJ's

credibility findings.  (SOE at 10–11; Reply at 2–3.)  "The ALJ's assessment of credibility is

entitled to great weight and deference, since he [or she] had the opportunity to observe the

witness's demeanor." *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters

v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*,

255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination,

stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide

questions of credibility" (citation omitted)).  This deference extends to an ALJ's credibility

determinations "with respect to [a claimant's] subjective complaints." *Allen v. Comm'r of Soc.

Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Human Servs.*, 823

F.2d 918, 920 (6th Cir. 1987)).  Despite this deference, "an ALJ's assessment of a claimant's

credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531.  Furthermore,

the ALJ's decision on credibility must be "based on a consideration of the entire record."

*Rogers*, 486 F.3d at 247 (internal quotation omitted).  An ALJ's explanation of his or her

---

[3] For the same reasons, this record also supports the conclusions of the state-agency physicians,
Drs. McKee and Manos.

credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248.

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. In addition, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of medication; and treatment other than medication. 20 C.F.R. § 404.1529(c)(3); SSR 16-3P, 2016 WL 1119029 (March 16, 2016); *but see Storey v. Comm'r of Soc. Sec.*, No. 98-1628, 1999 WL 282700, at *3 (6th Cir. Apr. 27, 1999) ("[T]he fact that [the ALJ] did not include a factor-by-factor discussion [in his credibility assessment] does not render his analysis invalid.").

In evaluating Plaintiff's credibility with respect to her subjective claims, the ALJ must determine whether there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). Second, if the ALJ finds that such impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities. *Kalmbach v. Comm'r or Soc. Sec.*, 409 F. App'x 852, 863 (6th Cir. 2011). Pursuant to SSR 16-3p, the ALJ must evaluate seven factors in determining credibility:

> In addition to using all the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms, we will also use the factors set forth in 20 CFR 404.1529(c)(3) and 416(c)(3). These factors include:
>
> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of pain other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3P, 2016 WL 1119029 (March 16, 2016).

SSR 16-3p tasks the ALJ with explaining his credibility determination with sufficient specificity as "to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Brothers v. Berryhill*, Case No. 5:16-cv-01942, 2017 WL 29125, at *11 (N.D. Ohio June 22, 2017) (citing *Rogers*, 486 F.3d at 248).

Here, the ALJ properly noted that Plaintiff's own testimony undermines her allegations regarding the severity and persistence of her symptoms and functional limitations they allegedly cause. Plaintiff testified that, notwithstanding certain pain or numbness, she continues to work in her family cleaning business and lifts approximately twenty to twenty-five pounds when performing these tasks. (R. at 64–65, 75–76.) The ALJ also properly considered Plaintiff's ability to perform "a variety of activities of daily living" (R. at 51) when assessing her credibility. *See Blacha v. Sec'y of HHS,* 927 F.2d 228, 231 (6th Cir. 1990) ("As a matter of law, an ALJ may "consider household and social activities" in evaluating a claimant's subjective claims.); *Hensley v. Comm'r Soc. Sec.*, Case No. 1:15-cv-11, 2017 WL 1055152, at *5 (S.D. Ohio March 21, 2017) (finding ALJ properly evaluates the plaintiff's daily activities in assessing credibility). For example, Plaintiff testified that while she has to take some breaks, she cooks for

herself and her husband and cleans up after doing so.  (R. at 70, 78–79.)  Although her husband

drives her to the grocery store, she is responsible for grocery shopping.  (R. at 72, 78.)  Plaintiff

also does the laundry and straightens their six-room trailer home.  (R. at 71, 77–78.)  In addition,

Plaintiff socialized with friends and played with her five grandchildren.  (R. at 72–73.)

 Moreover, the ALJ properly discounted Plaintiff's allegations regarding the severity and

persistence of those symptoms and the alleged limitations they caused that were inconsistent

with her medical record.  *See Carpenter*, 2017 WL 1038913, at *11 (finding that the ALJ did not

err in finding that the severity of the plaintiff's complaints were inconsistent with the objective

medical evidence where, *inter alia*, there were few instances showing a decreased range of

motion with her back; the plaintiff exhibited only slight limitations during the consultative

examination; the plaintiff's impairments were managed with medication; and the plaintiff was

able to perform certain household chores and engage in certain activitites); *Cook v. Comm'r of

Soc. Sec.*, No. 1:15-cv-592, 2016 WL 3944757, at *7 (S.D. Ohio June 29, 2016) *R&R adopted by*

2016 WL 3945695 (S.D. Ohio July 19, 2016) ("Thus, it is proper for an ALJ to discount the

claimant's testimony where there are contradictions among the medical records, his testimony,

and other evidence.") (citing *Warner v. Comm'r of Soc. Sec.*, 375 F.3d at 387, 392 (6th Cir.

2004)).  The ALJ specifically noted that "[t]here is no indication in any of the claimant's

treatment records that her conditions cause any work-related activities."  (R. at 50.)  He went on

to note that the medical records reflected Plaintiff's own admission that she experienced

"significant benefit in symptoms with taking pain medications when needed[.]"  (*Id*.)  The ALJ

further relied on the opinions of Drs. Sethi, McKee, and Manos, which the Undersigned has

already determined were supported by the medical evidence in this case.

In short, the Undersigned concludes that the medical evidence and Plaintiff's testimony regarding her daily activities amply support the ALJ's assessment of Plaintiff's credibility. Accordingly, the ALJ's determination that Plaintiff did not suffer from an impairment or combination of impairments that significantly limits her ability to perform basic work activities enjoys substantial support in the record and conforms to all applicable standards. *See, e.g.*, *Carpenter*, 2017 WL 1038913, at *11; *Baker*, 2017 WL 1424898, at *6 (concluding that the plaintiff failed to meet her burden at step two when she failed to presented objective medical evidence establishing that she was significantly limited by her impairments); *Turner*, 2015 WL 251496, at *4 ("Because Plaintiff has pointed to no evidence showing any lasting or credible work-related restrictions during the relevant period, substantial evidence supports the ALJ's decision, and the decision is AFFIRMED.").

## VII.    CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VIII.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

**IT IS SO ORDERED.**

Date:  August 18, 2017

 *s/ Elizabeth A. Preston Deavers*
ELIZABETH A. PRESTON DEAVERS
UNITED STATES MAGISTRATE JUDGE